**JOHANN SAILER, Plaintiff**

**v.**

**RONALD TONKIN, MACON BERRYMAN, ELDRIDGE
WAITE, ERIC O'NEAL as Criminal Victims
Compensation Commission, Defendants**

Civil No. 156-1972

District Court of the Virgin Islands

Div. of St. Thomas and St. John

March 14, 1973

BAILEY, WOOD, & ROSENBERG, ESQS. (BAILEY & WOOD,
ESQS., of counsel), St. Thomas, V.I., *for plaintiff*

ATTORNEY GENERAL of the Virgin Islands, St. Thomas,
V.I., *for defendants*

YOUNG, *Judge*

## MEMORANDUM OPINION

■ The plaintiff, an Austrian national who was in the employ of the German Atlantic Line on the cruise ship "Hanseatic" at the time of his injury,[1] has brought this suit to test the constitutionality of 34 V.I.C. § 161. That section is part of the territorial Criminal Victims Compensation Act and specifically bars non-resident aliens, among other classes of persons, from enjoying the benefits offered under the Act to victims who have sustained injuries as a result of criminal acts in the Virgin Islands. This matter is ripe for disposition by summary judgment, there being no issue of fact to be resolved. Rule 56 Fed. R. Civ. Proc. Sailer argues that under the circumstances such a statutory distinction violates the precepts of equal protection which operate as part of the guarantees of the Fourteenth Amendment to our Constitution. I agree with that position

---

[1] According to the complaint, Sailer was attacked by three men as he was returning to his ship in the late evening hours of March 13, 1972. During the ensuing scuffle the plaintiff was shot several times and as a result incurred a permanent paralysis from the waist down.

and hereby declare that the classification made under section 161 is constitutionally impermissible inasmuch as the distinction is wholly unrelated to the central designs of the Act.

## I

The issue here is whether the Equal Protection Clause of the Fourteenth Amendment, which was made applicable to this Territory in 1968,[2] prevents the Territory from conditioning compensation to victims of criminal acts upon the residency status of an alien. Section 161 of Title 34 provides that:

". . . no person who is not a citizen of the United States or who is not an immigrant alien admitted to the United States for permanent residence under the pertinent provisions of the Immigration and Nationality Act, as amended (8 U.S.C. §§ 1101 et seq.), may apply for or receive compensation under the provisions of this chapter."[3]

It is evident from the language of the statute that, were the challenged classification constitutionally sound, the plaintiff would be ineligible for the benefits afforded under the Act. Moreover, because of the language of the statute, it would appear that the so-called "bonded aliens" who reside and work in these islands on a temporary basis are also precluded from participating in the compensation scheme. See 8 U.S.C. § 1101(a)(15)(H). However, on these facts I am not called upon to decide that question,

---

[2] I note with interest that section 161 was enacted prior to the Act of Congress which extended the Equal Protection Clause to the Virgin Islands. That section of the Criminal Victims Compensation Act was enacted on March 6, 1968, 1968 Sess. L., Part I, § 2, at 27, the amendment to section 3 of the Revised Organic Act of 1954 was legislated on August 23, 1968, 82 Stat. 841 (1968).

[3] According to the federal statute "lawfully admitted for permanent residence" is taken to mean:
"the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not being changed."
8 U.S.C. § 1101(a)(20). A significant portion of the aliens present in the Virgin Islands are not permanent alien residents.

though were I to do so, I would rule as I have on the issue presently before me.

▮▮▮ Under the Fourteenth Amendment, aliens as well as citizens are encompassed in the word "persons." Truax v. Raich, 239 U.S. 33, 39 (1915). Therefore, it has long been the law that the benefits of the Equal Protection Clause are available to aliens lawfully present in the United States and its territories.[4] Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 420 (1948); Graham v. Richardson, 403 U.S. 365, 371 (1971); Note, Equal Protection and Supremacy Clause Limitations on State Legislation Restricting Aliens, 1970 Utah L. Rev. 136. This is so even though the alien may at the time be ineligible for citizenship. See Fujii v. State, 38 Cal.2d 718, 242 P.2d 617 (1952). Two of the more significant rulings which reinforce this point of law have their origins in our jurisdiction. Chapman v. Gerard, 8 V.I. 470, 456 F.2d 577 (3rd Cir. 1972) (alien students lawfully residing in the Virgin Islands entitled to participate in Territorial Scholarship Fund); Hosier v. Evans, 8 V.I. 27, 314 F.Supp. 316 (1970) (Non-citizen children entitled to attend public schools). More recently, in West v. Creque, Civil No. 108/1972, Division of St. Croix, the right to participate in the public housing program administered by the Virgin Islands Housing Authority was extended to certified workers (bonded aliens) by stipulation of the parties. The theories upon which those decisions are based are well known and need not be rehearsed here.

▮▮▮ It is sufficient to observe that in the vast majority of the equal protection cases the applicable test used to measure what is asserted to be a denial of protection under a statute is whether the legislative categoriza-

---

[4] In fact, under certain circumstances the doctrine of equal protection has been made available even to those aliens who may be in violation of immigration laws in our jurisdiction. Williams v. Williams, 8 V.I. 244, 328 F.Supp. 1380 (1971).

tion bears a rational relationship to a state objective. Dandridge v. Williams, 397 U.S. 471, 485 (1970). Yet courts which have been faced with questions similar to that which I am to resolve here have repeatedly held that any legislative classification based on alienage will receive the same rigorous judicial scrutiny as classifications which are based on race or nationality, for, in the words of the Supreme Court's decision in Graham, and its companion case Sailer v. Leger, such categories are "inherently suspect." Graham v. Richardson, supra, at 372. To my mind, that means that the local government must meet the demand of demonstrating that the statutory classification is linked to a compelling and overriding state interest. Shapiro v. Thompson, 394 U.S. 618, 627 (1969). Under the circumstances it is then incumbent upon the government to come forward with facts that will satisfactorily establish the nature of this statutory classification, which on its face singles out those who are non-resident aliens as the objects of unequal treatment. See Nielsen v. Secretary of Treasury, 424 F.2d 833, 846 (D.C. Cir. 1970). If such a classification is to withstand this constitutional attack, the type of interests which are sought to be protected by the statutory classification necessarily must be either constitutionally permitted as a governmental function or represent an interest so compelling that the classification is justified by the nature of the interest. Shapiro v. Thompson, supra.

■ The defendants have attempted to explore, for the benefit of this Court, a mutation of a rationale which has survived the compelling interests test. In an effort to assume their burden, defendants advance the somewhat ingenious and provincial "native son" argument that the exclusion of visiting aliens from protection under the Act can be justified on the basis that a government may regulate the dispersal of its public funds in favor of its citizen and permanent-resident aliens, who purportedly are

taxpayers. To support their theory they cite Dandridge v. Williams, supra, and King v. Smith, 392 U.S. 309 (1968), neither of which dealt with the issue of equal protection of aliens. In Dandridge the Supreme Court upheld a state welfare regulation which established a ceiling on the amount of money which could be disbursed monthly to welfare families. The suit was brought to test whether the establishment of a ceiling which eschewed a consideration of the size and needs of some families was constitutional. The court held that it was. From this ruling the defendants make a somewhat startling extension of reasoning and argue that because local governments can regulate welfare payments they may also establish a scheme for compensating victims of criminal acts which will aid nationals and permanent-resident aliens but will not aid visiting aliens. To assert that the case at hand is distinguishable is to place accent on the obvious. While I have no argument with the Supreme Court's observation in King that states "have considerable latitude in allocating their [welfare] resources," supra, at 318, I am constrained to observe that that principle was not at issue in the case, and neither is it present here. Nevertheless, on the basis of rather inapposite authority the defendants have sought repeatedly to support practices of the territorial government which have countenanced discrimination based on alienage. See Hosier v. Evans, 8 V.I. 27, 36, 314 F.Supp. 316 (1970); Chapman v. Gerard, 8 V.I. 470, 474, 456 F.2d 577 (3rd Cir. 1972). That disbursal of funds argument as it relates to treatment of aliens under our laws has been roundly rejected by prior decisions on the theory that maintenance of the fiscal integrity of the program as a governmental objective cannot serve as a justification for the establishment of a scheme which denies aliens equal protection. It is one thing to administer a welfare program, quite

another to deny the protection of local law to aliens without showing a compelling interest.

## II

I have searched in vain for a reasonable link between the territorial interest sought to be advanced by the Criminal Victims Compensation Act and the exclusion of visiting aliens from the umbrella of relief reported to be extended to those who incur physical injuries resulting from criminal acts in the Virgin Islands. The classification is void of the necessary supporting facts as required by Morey v. Doud, 354 U.S. 457 (1957), and its predecessor, Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79 (1911). And it falls far short of meeting the compelling interest test of Shapiro. I note, with great interest, that the statement of policy upon which the Act is predicated makes the following policy declaration:

> . . . the Legislature determines and declares, as a matter of public policy, that no innocent victim of any criminal offense covered by this chapter . . . shall be constrained to bear the financial responsibility of resulting personal injury or death, and that the Government of the people of the Virgin Islands shall compensate any such victim . . . for the loss resulting from such injury or death.

34 V.I.C. § 152. The language of that section articulates the interests which are sought to be served, all of which are born of the recognition that if we are to enhance the effectiveness of our criminal justice system we must enlist the cooperation of the public at large as a means of stemming the tide of increasing criminality in the Territory. It is evermore apparent that as a social phenomenon, crime is no respecter of persons. The victims of criminal acts come from all walks of life; no distinctions as to victims are made on the basis of race, sex, religion, or national origin. In a very real sense, crime is incapable of making discriminating choices. Because I am empowered to do so,

I must take judicial notice of the fact that due to their geographic location, these islands are visited, year in and year out, by many persons who are neither residents of the Virgin Islands nor citizens of the United States. Not infrequently these visiting aliens become the targets of criminal acts, and in some instances, they are victimized by physical abuse. To distinguish between those persons and the class of persons which now come within the sphere of protection of the compensation act is a rather irrational departure from the policy which underpins the compensation legislation. Their present exclusion bears no relationship whatsoever to the objective for which the act was legislated, which as I read it was to provide some incentive for public involvement as a method of deterring crime on one hand and increasing the efficiency of the criminal justice system on the other. By creating such a classification the interests sought to be advanced by the Act are retarded rather than stimulated. The doctrines of the Fourteenth Amendment dictate that provisions of the Criminal Victims Compensation Act be extended to the visiting aliens and that they be given fair, nondiscriminatory treatment equal to that afforded nationals and permanent-resident aliens. That is not to say that they must receive recovery, for they must meet the other reasonable requirements of the Act, but they must be given the opportunity to make application. If the opportunity of full participation were to be denied them, the vibrancy of the constitutional principle of equal protection would be lessened.