LEHNDORFF GENEVA, INC., Appellant, v. WARREN, Respondent.

*No. 761 (1974). Argued March 1, 1976.—*
*Decided November 16, 1976.*
(Also reported in 246 N. W. 2d 815.)

For the appellant there were briefs by *Robert A. Christensen* and *Foley & Lardner* of Milwaukee, and oral argument by *Mr. Christensen.*

For the respondent the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

A brief amicus curiae was filed by *William F. Nelson* and *Stafford, Rosenbaum, Rieser & Hansen* of Madison, on behalf of State of Wisconsin Department of Business Development and Lawyers Title Insurance Corporation.

DAY, J. The principal questions on this appeal are whether sec. 710.02, Wis. Stats.[1] limiting non-resident

---

[1] "710.02 *Limitation on nonresident aliens and corporations.* It shall be unlawful for any alien not a resident of this state, of some state or territory of the United States or of the District of Columbia, or for any corporation not created by or under the laws of the United States or of some state or territory thereof, to hereafter acquire, hold or own more than 640 acres of land in

alien ownership of land violates the equal protection clause of either the United States or Wisconsin constitutions or is contrary to a treaty between the United States and the Federal Republic of Germany (hereinafter West Germany). We conclude that the answer to all three questions is no.

The case comes to us on appeal from a declaratory judgment declaring the statute applicable to the plaintiff, not violative of constitutional rights and not in contravention of the treaty with West Germany.

This action was brought by Lehndorff Geneva, Inc. (LGI) as the general partner of Lehndorff Farms, Inc.,[2] (Farms). The latter holds options to purchase certain properties.[2.5] The state argues that a limited partnership is not protected by the equal protection clause. However, Farms stands to bear the loss of a forfeiture under the statute and may therefore challenge its constitutionality through an action brought by a general partner. What we say in this opinion with respect to Farms would apply equally to LGI if it were the sole owner of the options and sought a declaration of rights.

this state or any interest therein except such as may be acquired by devise, inheritance or in good faith in the collection of debts by due process of law. No corporation or association more than 20% of the stock of which is or may be owned by any person who is such nonresident alien shall hereafter acquire, hold or own more than said quantity of land in this state or an interest in a greater quantity of land herein except such as may be acquired in good faith in the collection of debts by judicial proceedings. All lands acquired, held or owned in violation of the provisions hereof shall be forfeited to the state, and it shall be the duty of the attorney general to enforce every such forfeiture. The prohibitions contained in this section shall not apply to railroad or pipeline corporations."

[2] "179.26. *Parties to actons.* A contributor, unless he is a general partner, is not a proper party to proceedings by or against a partnership, except where the object is to enforce a limited partner's right against or liability to the partnership."

[2.5] Farms has purchased some property in Wisconsin, though less than 640 acres, subsequent to commencing this action.

LGI is a Texas corporation duly qualified to do business in Wisconsin with its principal place of business, Chicago, Illinois. The entire stock of LGI is owned by nonresident aliens, citizens of West Germany.[3] The limited partners are citizens of West Germany.[4] Farms alleges in the complaint for declaratory judgment that it is owner of options to purchase certain real estate in Wisconsin in excess of 640 acres and that if it acquired such properties the attorney general would enforce the forfeiture provision of sec. 710.02, Stats. The defendant Attorney General demurred to the complaint. The demurrer was overruled. Because the facts were not in controversy, the court went on to declare the rights of the parties.

## APPLICABILITY OF STATUTE TO LIMITED PARTNERSHIPS

Farms argues that as a limited partnership it is not covered by the statute, which refers to individuals, corporations and associations. This interpretation would vitiate the statute. The meaning of the term "association" in a statute depends on the context and the subject matter of the law as well as upon an historical view of the statute.[5] When the statute before us was originally adopted in 1887, the Wisconsin Statute contained a chapter on limited partnerships[6] originally en-

---

[3] The parties stipulated to the facts as set forth in the complaint. The complaint merely alleged that LGI has two stockholders, both citizens of the Federal Republic of Germany.

[4] Plaintiff states none are residents of the United States.

[5] *St. Johns Military Academy v. Edwards*, 143 Wis. 551, 128 N.W. 113 (1910).

[6] Annotated Statutes of Wisconsin, Sanborn and Berryman 1889, Chapter LXXXI, sec. 1703. "Limited partnerships . . . may be formed by two or more persons. . . ."

"Sec. 1704. Such partnerships may consist of one or more persons . . . who shall contribute, in actual cash payments, a spe-

acted as sec. 1, chap. 97, Laws of 1857. The statute on limited partnerships referred to "control" and "common stock."

It would be unreasonable to believe the Legislature intended to exclude limited partnerships when it referred to "associations" in what is now sec. 710.02, Stats. We hold that under this statute the term "association" includes limited partnerships and thus applies to the appellant, Farms.

Farms makes a very strong argument that foreign investment in land as in other propery should be encouraged. Farms argues in effect that in today's economic world the restrictions contained in this 89 year old law are an anachronism and should be abolished. Maine and Wisconsin maintain offices in Frankfort, West Germany for the express purpose of encouraging foreign investment in Wisconsin.[7] Direct foreign investment in this country has risen from $6.9 billion in 1960 to $21.7 billion in 1974, foreign investment in stocks and bonds is estimated at between $80 to $85 billion. "For the most part the phenomenon has been attributed to investment by European citizens and the giant European companies. . . ."[8] Nonresident aliens, Farms argues, are allowed unlimited investment in business and industry. Why not in land? But these are arguments that should be addressed to the Legislature rather than to this court for this is a policy decision. The federal government has seen fit, as will be discussed later, to leave the issue of nonresident alien land holding up to the states. Wisconsin since 1887 has chosen to allow only a limited right to hold land and has refused as recently as

cific sum as capital to the common stock who shall be called special partners. . . ."

[7] "State Regulation of Foreign Investment" by L. B. Barnes III, 9 *CORNELL INTERNATIONAL LAW JOURNAL*, No. 1., p. 82, Dec. 1975.

[8] *Ibid.*, p. 83.

the 1975 legislative session to change the policy. Our role is limited to determining whether such restriction contravenes the United States or Wisconsin constitutions or conflicts with superior federal law, in this case an international treaty.

## EFFECT OF TREATY WITH WEST GERMANY

Farms argues that sec. 710.02 denies rights granted to it under a "Treaty of Friendship, Commerce and Navigation" (FCN) between the United States and West Germany[9] and is therefore unconstitutional under Article VI, United States Constitution.[10] However, the sections of the treaty cited by Farms contain no provisions which would prohibit a state from enforcing provisions such as those contained in the statute before us.

The pertinent portions of the FCN Treaty are as follows:

### ARTICLE VII

"1. Nationals and companies of either Party shall be accorded, within the territories of the other Party, national treatment with respect to engaging in all types of commercial, industrial, financial and other activity for gain, whether in a dependent capacity, and whether directly or by agent or through the medium of any form of lawful juridical entity. Accordingly, such nationals and companies shall be permitted within such territories: (a) to establish and maintain branches, agencies, offices, factories and other establishments appropriate to the conduct of their business; (b) to organize companies under the general company laws of such other Party, and to acquire majority interests in companies of such other Party; and (c) to control and manage enterprises which they have established or acquired. More-

---

[9] 7 U.S.T. 1839 (1956).

[10] ". . . (A)ll treaties made, or which, shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary not withstanding."

over, enterprises which they control, whether in the form of individual proprietorships, companies or otherwise, shall in all that relates to the conduct of the activities thereof, be accorded treatment no less favorable than that accorded like enterprises controlled by nationals or companies of such other Party.

"2. Each Party reserves the right to limit the extent to which aliens may establish, acquire interests in, or carry on enterprises engaged within its territories in communications, air or water transport, taking and administering trusts, banking involving depository functions, or the exploitation of land or other natural resources. . . ."

## ARTICLE IX

"1. Nationals and companies of either Party shall be accorded within the territories of the other Party: (a) national treatment with respect to leasing land, buildings and other real property appropriate to the conduct of activities in which they are permitted to engage pursuant to Articles VII and VIII and for residential purposes, and with respect to occupying and using such property; and (b) other rights in real property permitted by the applicable laws of such other Party.

"2. Nationals and companies of either Party shall be accorded, within the territories of the other Party, national treatment and most-favored nation treatment with respect to acquiring, by purchase, lease, or otherwise, and with respect to owning and possessing, personal property of all kinds, both tangible and intangible. However, either Party may impose restrictions on alien ownership of materials dangerous from the standpoint of public safety and alien ownership of interests in enterprises carrying on the activities listed in the first sentence of paragraph 2 of Article VII, but only to the extent that this can be done without impairing the rights and privileges secured by Article VII or by other provisions of the present Treaty.

"3. Nationals and companies of either Party shall be accorded national treatment, within the territories of the other Party, with respect to acquiring property of all kinds by testate or intestate succession or under judicial sale to satisfy valid claims. Should they because of their alienage be ineligible to continue to own

any such property, they shall be allowed a period of at least five years in which to dispose of it."

*Webster's Third New International Dictionary* defines "exploit" as "to turn a natural resource to economic account." This would certainly be true of Farms contemplated use for agricultural purposes of the lands sought to be acquired. The Treaty does not require that nonresident aliens be allowed to acquire land. The authority to limit "exploitation of land" has been interpreted as authorizing restrictions on the use of land not applicable to nationals and has been so interpreted in the *Report to the Congress, Foreign Direct Investment in the United States,* U. S. Department of Commerce 1976 at page 191.

"In some treaties, the United States reserves the right to limit alien exploitation of land and natural resources, and by implication, alien ownership of land."

Obviously our statute is designed to limit land exploitation by nonresident aliens. There is no provision in the treaty giving nonresident nationals of West Germany the right to purchase and hold land contrary to existing state law on the subject. The only right given to West German nationals is the right to lease land for certain specified and limited economic activities. Agriculture is not one of those enterprises.

In an article in *The American Journal of Comparative Law* entitled, "Treaties for the Encouragement and Protection of Foreign Investment: Present United States Practice" by Herman Walker, Jr., Vol. 5, 229, 237, the author says, ". . . the sweeping national treatment rule is not feasible, or else is not adequate, in the matters of real property tenure . . . because of inhibitions laid on treaty making by certain state laws. . . ." He cites the treaty with the Netherlands as a case in point.

In the Treaty with the Netherlands dated March 27, 1956 the United States recognized the possibility of individual states imposing land restrictions on foreign

nationals, 8 U.S.T. 2043, 2056 (1957) Art. IX, pars. 1 and 2.

" . . .

"1. (b) other rights in real property permitted by the applicable laws of the States, Territories and possessions of the United States of America.

"2. Nationals and companies of the United States of America shall be accorded, within the territories of the Kingdom of the Netherlands, national treatment with respect to acquiring by purchase, lease or otherwise, and with respect to owning, occupying and using land, buildings and other real property. However, in the case of any such national domiciled in, or any such company constituted under the laws of, any State, Territory or possession of the United States of America that accords less than national treatment to nationals and companies of the Kingdom of the Netherlands in this respect, the Kingdom of the Netherlands shall not be obligated to accord to such national or company treatment more favorable in this respect than such State, Territory or possession accords to nationals and companies of the Kingdom of the Netherlands."

 Thus recognition is given to the fact that states do have authority to restrict land ownership by aliens. We hold that sec. 710.02, Stats. does not contravene the Treaty with West Germany.

## EQUAL PROTECTION

In equal protection analysis one question is the standard of review to be applied. The question is what degree of deference the court owes the legislative line-drawing which distinguishes nonresident aliens from others in the purchase of Wisconsin land. Farms argues that alien classifications are inherently suspect and thus subject to strict scrutiny[11] and that therefore the state

[11] *Graham v. Richardson* (1971), 403 U.S. 365, 29 L. Ed.2d 534, 91 S. Ct. 1848; *Sugarman v. Dougall* (1973), 413 U.S. 634, 37 L. Ed.2d 853, 93 S. Ct. 2842.

bears "a heavy burden of justification" to justify the classification,[12] requiring a "compelling" rather than a merely reasonable explanation for the statutory classification.[13]

The state argues the burden of proof is upon Farms to establish the invalidity of the classification and any reasonable basis for the classification will validate the statute.[14] The U. S. Supreme Court decisions cited by Farms, it asserts, do not require strict scrutiny of statutes which single out only *non*resident aliens.

■ ■ Aliens within the jurisdiction of the state are unquestionably entitled to the equal protection of its laws. *Yick Wo v. Hopkins* (1889), 118 U.S. 356; *Mathews v. Diaz* (1976), — U.S. —, 48 L. Ed.2d 478, 96 S. Ct. 1883. It is also beyond doubt that resident aliens enjoy the "heightened judicial solicitude" of a suspect class. *Graham v. Richardson* (1971) *supra*, 403 U.S. at 372; *Sugarman v. Dougall* (1973), 413 U.S. 634, 642, 37 L. Ed.2d 853, 93 S. Ct. 2842; *In re Griffiths* (1973), 413 U.S. 717, 721, 37 L. Ed. 910, 93 S. Ct. 2851. In considering the applicability of these decisions to nonresident aliens, two points emerge. The first is that these cases deal only with resident aliens; second, the question of whether nonresident aliens constitute a suspect class has not been decided, either in these opinions or in any other jurisdiction.[15]

[12] *In re Griffiths* (1973), 413 U.S. 717, 721, 37 L. Ed.2d 910, 93 S. Ct. 2851.

[13] *VandenBroek (Town of) v. Reitz* (1971), 53 Wis.2d 87, 93, 191 N.W.2d 913.

[14] *Omernik v. State* (1974), 64 Wis.2d 6, 18–19, 218 N.W.2d 734.

[15] *Sailer v. Tonkin* (V.I. 1973), 356 F. Supp. 72, did use strict scrutiny to invalidate a nonresident alien classification. But the court did not analyze the possible distinctions between resident and nonresident aliens. The court held that the portion of the Virgin Islands Criminal Compensation Act which denied compensation to a nonresident alien visitor to the territory did not meet the compelling state interest necessary for a suspect class.

As to resident aliens the United States Supreme Court said:

"The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogenous legal classification. For a host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other; and the class of aliens is itself a heterogeneous multitude of persons with a wide-ranging variety of ties to this country." *Mathews v. Diaz, supra,* 48 L. Ed.2d at 489.[16]

*Graham v. Richardson, supra,* was the first in a line of recent cases to hold that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." 403 U.S. at 372. "Aliens as a class," the court wrote, "are a prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate. Accordingly, it was said in *Takahashi*[17] that 'the power of a state to apply its laws exclusively *to its alien inhabitants* as a class is confined within narrow limits.' " (Emphasis supplied).

This court is now called on to decide whether nonresident aliens have the same rights as resident aliens with respect to the purchase of real property.

---

[16] The due process clause of the Fifth Amendment contains an equal protection guarantee regulating federal action comparable to the one explicitly contained in the Fourteenth Amendment, *Bolling v. Sharpe* (1954), 347 U.S. 497. It is also clear, however, that the federal government has far more leeway to classify aliens pursuant to its immigration and naturalization powers than do the states under the Fourteenth Amendment. *Hampton v. Mow Sun Wong* (1976), — U.S. —, 48 L. Ed.2d 495, 96 S. Ct. 1895.

[17] *Takahashi v. Fish and Game Commission* (1947), 334 U.S. 410, 420, 92 L. Ed. 1478, 1488, 68 S. Ct. 1138.

*Graham* held that a state could not condition the receipt of welfare benefits on longtime residency or citizenship.[18] The aliens were lawfully admitted residents who were either disabled or unemployed. All were denied public assistance because of their alienage. The States of Arizona and Pennsylvania contended their restrictions on the eligibility of aliens for public assistance were justified by "a state's 'special public interest' in favoring its own citizens over aliens in the distribution of limited resources such as welfare benefits." This the court considered unpersuasive:

"We agree with the three-judge court in the Pennsylvania case that the 'justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens. Aliens like citizens pay taxes and may be called into the armed forces. Unlike the short-term residents in Shapiro, aliens may live within a state for many years, work in the state and contribute to the economic growth of the state.' 321 F. Supp., at 253. See also *Purdy & Fitzpatrick v. California,* 71 Cal.2d 566, 581–582, 456 P.2d 645, 656 (1969). There can be no 'special public interest' in tax revenues to which aliens have contributed on an equal basis with the residents of the State." 403 U.S. at 376.

It can be seen that the inequity of singling out aliens did turn on characteristics of resident aliens. Like citizens, they pay taxes, serve in the military and contribute to economic growth. It is the class of resident aliens and not aliens worldwide who are similarly situated to citizens with respect to taxes, military service and overall contribution to the country.

A clash between the challenged state laws and overriding national policies on immigration and naturalization was a second rationale for the result in *Graham.*[19] Again, this line of reasoning was most relevant to resident, and not nonresident aliens.

---

[18] 403 U.S. at 374.
[19] 403 U.S. at 376 et seq.

The premise of this rationale is that it is the responsibility of the national government to regulate matters of immigration and naturalization. Once Congress and the executive have exercised this power, ". . . aliens lawfully within this country have a right to enter or abide in any state in the Union 'on an equality of legal privileges with all citizens under nondiscriminatory laws.' *Takahashi,* 334 U.S. at 420, 92 L. Ed. at 1487." *Graham,* 403 U.S. at 378. A state policy of denying resident aliens government benefits available to others conflicts with this constitutionally derived federal power to regulate admission, naturalization and residence in the United States.

Just as a denial of welfare benefits to lawfully admitted aliens interferes with federal policy on immigration, so does state interference with the right to work for a living in the common occupations of the community. This is a principal factor in other cases in which the United States Supreme Court has shown special concern for aliens, starting with *Truax v. Raich* (1915), 239 U.S. 33, 41, 60 L. Ed. 131, 36 S. Ct. 7. *Truax* invalidated the Arizona "act to protect the citizens of the U.S. in their employment against non-citizens of the U.S., in Arizona." The court rejected the state's invocation of the police power to sustain the statute, which required most employers to hire 80 percent qualified electors or native-born citizens.

"The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the state would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work. And, if such a policy were permissible, the practical result would be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the states as chose to offer hospitality." 239 U.S. at 42.

The "right to work" theme is central in these alienage cases, sometimes in the context of the federal supremacy rationale and sometimes as part of the equal protection guarantee. Thus, *Sugarman v. Dougall, supra,* struck down a New York statute which disqualified persons from competitive civil service positions solely because they were aliens.[20]

*In re Griffiths, supra,* held that Connecticut's exclusion of a resident alien from the practice of law solely because of alienage violates the equal process clause of the fourteenth amendment. In each case, the factors which militated against a presumption of a constitutionality were clearly connected to the resident status of the aliens:

"Resident aliens, like citizens, pay taxes, support the economy, serve in the armed forces, and contribute in myriad other ways to our society. It is appropriate that a state bear a heavy burden when it deprives them of employment opportunities." 413 U.S. 722.

In summary, the cases which called for a "heightened judicial solicitude" toward aliens dealt with statutes which obstructed the normal affairs of life even though the national government had determined that the aliens in question could live in this country. As residents, these aliens bore the burdens imposed by society but not the sought-after benefits. Nor could they participate in the political process, which is the normal avenue of redress for a citizen unhappy with a governmentally-imposed

[20] The reasoning was on equal protection analysis. The court specifically declined to reach the issue of "whether the citizenship restriction is in conflict with Congress' comprehensive regulation of immigration and naturalization." 413 U.S. at 646. As in *Graham,* the court saw the inequity of denying non-sensitive jobs to persons who "reside lawfully in New York for a long period of time . . . pay taxes (and are) subject to serve in the country's armed forces." 413 U.S. 645.

burden. In this type of situation, the court repeatedly held, "heightened judicial solicitude" is appropriate.

None of these considerations appears in the instant case, in which foreign nationals who reside outside our borders have voluntarily associated with each other simply to have an investment vehicle here. The duties and burdens shared by the resident alien in common with the citizen entitles him to most of the benefits enjoyed by citizens. But burden sharing, except for payment of taxes in connection with the ownership or development of the land, is lacking in the case of the nonresident aliens in the case before us.

Moreover, they do not live in the community "handicapped by a lack of familiarity with our language and customs."[21] For these reasons, the inequities which befell the resident aliens in the cases relied on by Farms are simply not present here.

Measured against these considerations is the traditional prerogative of the states concerning land use and the history, older than this country, of special regulation of alien landholders. These factors are also relevant in deciding whether or not to apply a presumption of constitutionality in the instant case.

"But our scrutiny will not be so demanding where we deal with matters resting firmly within a state's constitutional prerogatives."[22]

Alien land laws pre-date our Declaration of Independence; they became part of the fabric of state law as the colonies received the common law from England.[23]

The right of a sovereign state to restrict land ownership by aliens is deeply imbedded in our law.

---

[21] *Hampton v. Mow Sun Wong*, — U.S. —, 48 L. Ed.2d 495, 96 S. Ct. 1895.

[22] *Sugarman*, 413 U.S. at 648.

[23] Sullivan, *Alien Land Laws: A Re-Evaluation*, 36 Temp. L.Q. 15 (1962).

Sir William Blackstone, writing on this subject in his *Commentaries On The Laws of England*[24] states:

"An alien born may purchase lands, or other estates: but not for his own use; for the king is thereupon entitled to them. If an alien could acquire a permanent property in lands . . . . the nation might in time be subject to foreign influence, and feel many other inconveniences."

The law cited by Blackstone made no distinction between resident and nonresident aliens.

Land law became primarily a problem of local state law. In general, a state could increase or decrease the disabilities of aliens in whatever manner it might choose.[25] In 1876 in a case concerning the law of succession, the U.S. Supreme Court wrote,

"The power of the State to regulate the tenure of real property within her limits, and the modes of its acquisition and transfer, and the rules of its descent, and the extent to which a testamentary disposition of it may be exercised by its owners, is undoubted. It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated. *McCormick v. Sullivan*, 10 Wheat. 202. The power of the State in this respect follows from her sovereignty within her limits, as to all matters over which jurisdiction has not been expressly or by necessary implication transferred to the Federal government." *United States v. Fox* (1876), 94 U.S. 315, 320.[26]

"(U)nder the American federal system, jurisdiction over the ownership and devolution of property vests in the separate states, and . . . in consequence the federal government historically has not sought to interfere

---

[24] 4th Ed., Book I, p. 372, Clarendon Press, Oxford, 1770.

[25] 1 *Powell on Real Property* (1973), Sec. 101, p. 377.

[26] Accord: *U. S. v. Burnison* (1950), 339 U. S. 87, 91–92; *Irving Trust v. Day* (1942), 314 U. S. 556, 562.

with state prerogatives in this field through exercise of the treaty-making power except to a carefully limited degree."[27]

The history of the rights of aliens to own property in Wisconsin predates statehood. By the *Statutes of the Territory of Wisconsin,* 1839, Section 6, p. 179[28] aliens, both resident and nonresident were permitted to own real estate with no restrictions as to amount. The Wisconsin constitution of 1848, Article I, section 15[29] gave *resident* aliens the same right to possess property as citizens. That provision still remains. No reference was made to nonresident aliens. The Wisconsin Statutes of 1849, Chapter 62, Section 35[30] gave aliens both resident and non-resident the right to acquire and hold land. This remained the law in this state until the enactment of Chapter 479, Laws of 1887[31] which restricted to 320

[27] *Sullivan, supra,* at 44.

[28] "It shall and may be lawful for any alien or aliens to purchase lands, tenements and hereditaments within this territory, and to have and to hold the same to himself, herself or themselves, to his, her or their heirs and assigns forever, as fully to all intents and purposes as any natural born citizen of the United States can, may or does."

[29] "No distinction shall ever be made by law between resident aliens and citizens, in reference to the possession, enjoyment or descent of property."

[30] "Any alien may acquire and hold lands, or any right thereto or interest therein, by purchase, devise or descent, and he may convey, mortgage and devise the same, and if he shall die intestate, the same shall descend to his heirs; and in all cases such lands shall be held, conveyed, mortgaged or devised, or shall descend, in like manner, and with like effect, as if such alien were a native citizen of this state, or of the United States."

[31] *"Section 1.* It shall be unlawful for any alien not a resident of this state or of the United States, or for any corporation not created by or under the laws of the United States, or of some state or territory of the United States, to hereafter acquire, hold

acres the amount of land a non-resident alien or a corporation or association 20% of whose stock was so owned could hold and provided for forfeiture of any excess. Several other states passed similar legislation at that time stemming from what was regarded as undesirable results from non-resident alien ownership of large tracts of land in other states.[32] By Chapter 576, Laws of 1951, the Statute was amended to increase the amount of acreage from 320 to 640 that such non-resident aliens and corporations could acquire and hold. A bill to repeal 710.-

or own more than three hundred and twenty acres of land in this state, or any interest therein, except such as may be acquired by devise, inheritance or in good faith in the course of justice in the collection of debts heretofore created.

"*Section 2.* No corporation or association more than twenty per cent of the stock of which is or may be owned by any person, corporation or association who are aliens not residents of this state or of the United States, shall hereafter acquire, hold or own more than three hundred and twenty acres of land in this state or any interest therein, except such as may be acquired in good faith in the course of justice in the collection of debts.

"*Section 3.* All property acquired, held or owned in violation of the provisions of this act, shall be forfeited to the state of Wisconsin, and it shall be the duty of the attorney-general to enforce every such forfeiture."

[32] Paul Wallace Gates, *Frontier Landlords and Pioneer Tenants* (Ithaca, New York: Cornell University Press, 1945), p. 43, Detlev F. Vagts, "United States of America's Treatment of Foreign Investment," *RUTGERS LAW REVIEW*, 1963, p. 392, cited in "A Survey of Alien Land Investment in the United States, Colonial Times To Present" by Terry L. Anderson, in *Report to the Congress, Foreign Direct Investment in the United States.* U. S. Department of Commerce (1976), p. L–2, L–14. This was a period of agricultural discontent in which legislatures feared "the large scale engrossment of farm land absentees," with resentment directed against both aliens and corporations. *Sullivan*, at p. 31; also see 1 *Powell, supra*, at Sec. 101, p. 374; for a description of one British land baron in the Midwest, *see*, 4 Ill. L. Rev. 27, 36 (1909).

02 Stats.[33] introduced in the 1975 session of the Wisconsin Legislature failed to pass.[34]

To be sure, this legislative prerogative is subject to constitutional strictures. For example, alien restrictions, which were racially discriminatory because they singled out Japanese residents, have been invalidated.[35]

The Wisconsin statute has no racial implications.

■ We conclude the plaintiffs do not possess the characteristics which warrant heightened judicial solicitude and the state has acted in an area traditionally within its province. Therefore the proper test is found in *Simanco v. Dept. of Revenue* (1973), 57 Wis.2d 47, 54, 203 N.W.2d 648. Only if a challenger can show that the classification is arbitrary and has no reasonable purpose or relationship to the facts or a justifiable and proper state policy will a legislative classification fall on the grounds of a denial of equal protection.

The state argues that absentee ownership of land can be potentially detrimental to the welfare of the community in which it is located and persons who are neither citizens nor residents are least likely to consider the welfare of the community in which the land is located.

---

[33] Senate Bill 451.

[34] Bulletin of the Proceedings of the Wisconsin Legislature, 1975 Session, Senate, p. 197–198, period ending July 24, 1976.

[35] *Oyama v. California* (1948), 332 U.S. 633, 92 L. Ed. 249, struck down California's alien land law. See also, *Namba v. McCourt* (1949), 185 Or. 579, 204 P.2d 569; *Fujii v. State* (1952), 38 Cal. 2d 718, 242 P.2d 617. Employment restrictions which invidiously singled out Japanese were held unconstitutional in *Takahashi v. Fish and Game Commission* (1947), 334 U.S. 410, 92 L. Ed. 1478. These cases changed the trend of earlier decisions. *Terrace v. Thompson* (1923), 263 U.S. 197, 68 L. Ed. 255, 44 S. Ct. 15 (Washington land law); *Porterfield v. Webb* (1923), 263 U.S. 225, 68 L. Ed. 276, 44 S. Ct. 21 (California land law); *Webb v. O'Brien* (1923), 263 U.S. 313, 68 L. Ed 318, 44 S. Ct. 112; *Frick v. Webb* (1923), 263 U.S. 326, 68 L. Ed. 323, 44 S. Ct. 115.

This rationale is not so "patently arbitrary"[36] as to require us to reject it. The U. S. Supreme Court recently sustained a section of the Medicare supplemental medical insurance program which denies eligibility to aliens unless they have been admitted for permanent residence and have also resided in the United States for at least five years. Granting the greater latitude which the federal government has over aliens, it is relevant that the court found affinity for the U. S. to be a valid consideration in sustaining the statute.

"But it remains true that some line is essential, that any line must produce some harsh and apparently arbitrary consequences, and, of greatest importance, that those who qualify under the test Congress has chosen may reasonably be presumed to have a greater affinity to the United States than those who do not." *Mathews v. Diaz, supra,* 48 L. Ed.2d at 492.[37]

The classification of nonresident aliens is sufficiently related to the state's asserted desire to limit possibly detrimental absentee land ownership to survive the test applied here. Limiting the benefits of land ownership to those who share in the responsibilities and interests of residency is not an unreasonable exercise of legislative choice. Farms challenges the distinction between corporations or associations 20 per cent or more of whose stock is owned by nonresident aliens and corporations or associations less than 20 per cent of whose stock is owned by nonresident aliens, and the distinction between those nonresident aliens who own less than 640 acres of land and those who would own more than 640 acres. It is axiomatic that line drawing is the essence of legislation;

[36] *State v. Ewald* (1974), 63 Wis.2d 165, 173, 216 N.W.2d 213.

[37] *Cf., Sugarman,* where, under the strict scrutiny standard, loyalty was rejected as a justification for singling out aliens. 413 U.S. 634, 641–643.

giving the underlying validity of the nonresident distinction, these lines are not unreasonable.[38]

We are mindful that the power of a state to apply its laws exclusively to aliens is exceedingly narrow. *Takahashi v. Fish and Game Commission* (1948), 334 U.S. 410, 420, 92 L. Ed. 1478, 68 S. Ct. 1138; all that is decided here is the question of whether a statute forbidding large land purchases by aliens not residents of this nor any other state or territory of the U. S. is constitutional.

We conclude that 710.02 Stats. does not violate the equal protection clause of the United States Constitution or Article I, Section 1 of the Wisconsin Constitution.

Amici filed a brief arguing sec. 710.02 violates international principles of justice. The source of these principles is federal case law dealing with Hungarian and Cuban expropriation of United States assets and the Restatement of the Law (2d), Foreign Relations Law of the United States (1965), §§185, 186. Sec. 186 states,

"Failure of a state to pay just compensation for taking the property of an alien is wrongful under international law, regardless of whether the taking itself was wrongful under international law."

In *United States v. Willow River Power Company,* 324 U.S. 499, 502, 89 L. Ed. 1101, 1107, 65 S. Ct. 761 (1945), Justice Jackson wrote,

"(N) ot all economic interests are 'property rights;' only those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion."

Sec. 710.02 puts nonresident aliens on notice that land acquisition in excess of 640 acres will be subject to forfeiture. Such a law is distinguishable from the expro-

---

[38] *State ex rel. Harvey v. Morgan* (1965), 30 Wis.2d 1, 9, 139 N.W.2d 585.

priation cases discussed by *amici*. Those cases involved seizures of property for reasons unknown at the time the property was lawfully acquired such as ex post facto changes in the property laws of the expropriating jurisdiction. The difference in the two situations is clear. We conclude sec. 710.02 does not violate international principles of justice.

*By the Court.*—Judgment affirmed.

ABRAHAMSON, J., took no part.