### SAN MARCOS CONSOLIDATED INDEPENDENT SCHOOL DISTRICT et al., Appellants,

v.

### Robert G. NANCE et al., Appellees.

### No. 11953.

Court of Civil Appeals of Texas, Austin.

May 16, 1973.

Rehearing Denied June 6, 1973.

Charles R. Ramsay, San Marcos, J. C. Hinsley, Austin, for appellants.

Douglass D. Hearne, Stayton, Maloney, Black, Hearne & Babb, Austin, for appellees.

SHANNON, Justice.

This appeal involves the construction and application of Vernon's Ann.St.Tex. Const. art. 8, Section 1–d,[1] which, in general, establishes a standard of assessment, other than fair market value, for land designated for agricultural use.

Appellees,[2] landowners in Hays County, filed suit in the district court of Hays County against appellants[3] to enjoin them from assessing or collecting ad valorem taxes on any other basis than a valuation for agricultural use for their lands for the years 1967 through 1971. After hearing on Oct. 29, 1967, the district court temporarily enjoined appellants from proceeding to assess or collect ad valorem taxes other than upon an agricultural use basis.

Upon trial of the merits to a jury, judgment was entered on January 24, 1972, that appellees' lands be designated for agricultural use under the amendment for the years 1967 through 1971. We will affirm the judgment.

The parts of the amendment which are relevant to this appeal are as follows:

"§ 1–d Assessment of lands designated for agricultural use

Sec. 1–d(a) All land owned by natural persons which is designated for agricultural use in accordance with the provisions of this section shall be assessed for

1. Usually referred to in this opinion as the "amendment."

2. Robert G. Nance, Jr.
Charles M. Decker, Jr.
Charles R. Williams
Thomas G. Williams
Don R. Williams
Daphna P. Farris
Bliss R. Spiller
L. R. Calhoun
Edd Posey
Otto A. Stoepler

3. (A) The San Marcos Consolidated Independent School District and its Board of Trustees,
Mrs. Benjamin M. Primer, Jr.
Celestino Mendez, Jr.
June Davis
Mrs. Rowland W. Manske
Eliazar Salinas
M. M. Martin
James W. Griffith
(B) The Board of Equalization of the San Marcos Consolidated Independent School District, composed of;
Marion McGee
Lloyd S. Box

Mrs. W. E. Norris, Jr.
(C) The Assessor and Collector of Taxes for Hays County,
Mrs. Charles E. Clayton
(D) The Hays County Consolidated School District and its Board of Trustees;
Delvin J. Simon
Lloyd Hennig
Raymond L. Czichos
Robert E. Schneider
Ralph D. Pfluger
Theodore H. Lehman
Timothy M. Harris
(E) The Board of Equalization of the Hays County Consolidated School District, composed of,
John D. Porter
Eric C. Dahlstrom
Erwin Rohde
Jack Payne
Blas M. Tenorio
and
(F) The Board of Equalization of Hays County, composed of
Max C. Smith
Eugene F. Posey
Benjamin R. Wranitzky
Robert E. Saunders
Leonard C. McCarty

all tax purposes on the consideration of only those factors relative to such agricultural use. 'Agricultural use' means the raising of livestock or growing of crops, fruits, flowers, and other products of the soil under natural conditions as a business venture for profit, which business is the primary occupation and source of income of the owner.

. . . . . .

(e) No land may qualify for the designation provided for in this Act unless for at least three (3) successive years immediately preceding the assessment date the land has been devoted exclusively for agricultural use, or unless the land has been continuously developed for agriculture during such time."

The land considered is generally to the west and north of San Marcos and, geographically, is a part of the Edwards Plateau region. The terrain is that of rough ridges and adobe flats. The hills are covered with canopies of mountain cedar and liveoak, while the draws are shaded by tenebrous cedar brakes and mottes of elm and pecan. Wild persimmon, agarita, and prickly pear vie with buffalo, three awn, and mesquite grass for light in the clearings, while in the more sheltered spots little bluestem, sideoats gramma, and, sometimes, Indian grass may be found. Despite occasional fence lifting downpours, rainfall is scant. And though at times the pastures may be clothed with flocks and the valleys covered over with corn,[4] dust and drought usually dry the springs and seeps, and the soaring winds wither the country side.

Appellees raise beef cattle, typically mixed-breeds, and many have spent years developing the best type of animal. Although most appellees have a history of raising Angora goats, in the years involved goat production decreased, most probably because of a decline in mohair prices. The bulk of the land is used for grazing, but with a few exceptions, most appellants cultivate small fields in more fertile spots to raise hay or small grains as forage for livestock.

The largest ranch involved is owned by Robert G. Nance, Jr., is composed of 2260.-7 acres, and is located near Kyle, while the smallest ranch is located north of Kyle and consists of 609 acres and is owned by Charles M. Decker. The average ranch involved is about 1550 acres.

The bulk of the gross income of all of the appellees is derived from their ranching operations. The gross income of Robert G. Nance, Jr., from agricultural operations, including income from deer leases, for the years 1964–70 inclusive ranged from a low of $23,843.66 to a high of $37,981.36. During the same period of time Nance received modest sums of money from interest and dividends and a stipend for attending bank directors' meetings at the First National Bank in San Marcos and the Citizen's State Bank of Kyle.

The gross agricultural income of C. M. Decker was $6,147.35 in 1964 while it was $5,278.99 in 1970. Mr. Decker, who was eighty years old at the time of trial, was unable to attend trial as he had suffered a heart attack while plowing his fields in preparation for planting. During the time at issue Mr. Decker, and wife Eula, received social security payments, and she drew teacher retirement as a result of teaching eighteen years in the San Marcos Schools. They also obtained small interest payments and dividends. Mrs. Decker occasionally received payments from an oil lease on property which she had received by inheritance. That payment in 1965 was $36.59.

During the period of inquiry the gross agricultural income, including income from deer leases, of Mrs. Daphna Farris varied from $9,412.47 to $18,466.16. In the course of that period Mrs. Farris worked part

---

4. Psalms 65:13

"The pastures are clothed with flocks; the valleys also are covered over with corn; they shout for joy, they also sing."

time at the Bank of Austin until she resigned in 1967. From 1968 to 1970, like several of the appellees, she leased her ranch for exploration by Shell Oil Company, but there was no discovery or production of minerals.

Between 1964 and 1970 there was a spread from $9,655.00 to $19,589.25 in the gross agricultural income of Charles Williams, including the income from deer leases. He also enjoyed oil and gas rentals from unsolicited mineral leases in the period at issue.

Otto Stoepler leased his ranch for deer hunting for only four years during the period under consideration at $300.00 each year. In that period his gross agricultural income fluctuated from $3,975.18 to $6,650.-87. Mr. and Mrs. Stoepler also drew social security payments and received oil and gas rentals for four years. Also, during this time they obtained moderate interest payments not exceeding $830.00 per annum.

The gross agricultural income of Bliss Spillar, including income from deer leases, from 1964 to 1970, ranged from a low of $11,121.94 to a high figure of $29,361.00. During the same period of time Spillar received interest and dividends from common stocks and savings accounts. Those total sums ranged from a low in 1964 of $1,695.-57 to $2,713.00 in 1970. Mrs. Spillar enjoyed an inconsiderable trust income during those years, and beginning in 1969 the Spillars received social security payments.

Thomas Williams received a gross agricultural income, including income from deer leases, from 1964 to 1970, of sums extending from $9,059.68 to $18,208.62. He, like several of the others, received oil and gas rentals, and in 1966, 1967, and 1968, he earned sums not over $575.00 each year by digging post holes and using his air hammer to do chores for neighbors.

In 1964, the gross agricultural income for Don Williams, including income from deer leases, was $10,025.43 while in 1970 it was $19,538.41. For four years he leased

his ranch for mineral exploration. He, like his brother, Thomas, also did a little work for neighbors. In 1969, in off hours, he earned a little by trying his hand at stretching and selling hides of ringtails, racoons and possums.

Of all of the appellees, the analysis of the gross income of L. R. Calhoun is the most complicated. His Hays County ranch consists of 1607 acres where he raised cattle and goats. On one part of his ranch there were stands of virgin mountain cedar and during several years cedar choppers cut the timber for posts which he sold. Although the cedar choppers brought him some posts cut from other lands, most of the posts which he sold came from his own ranch. Calhoun also leased several ranches in South Texas, and he would transfer cattle from one ranch to another depending upon grass conditions. The gross return from his agricultural activities, including the sale of posts from his ranch and returns from day deer hunting permits ranged from a low of $26,074.06 in 1960 to a high of $184,150.00 in 1969.

At trial time Edd Posey was in a rest home in New Braunfels. His aged wife, Nora, and his son, Edward, ran the 1040 acre ranch. In 1971, the ranch was leased for ranch purposes. Posey's gross agricultural income, including income from deer leases, for the years 1964–70 varied from a low of $9,027.77 to $13,311.42. Like many of the other appellees, Posey had leased the ranch for mineral exploration. In addition the Poseys received social security payments during a part of that time and also received interest payments ranging from a total of $384.77 per annum to $1,613.54 per annum. Also Mr. Posey received some installment payments on notes received on the sale of some acreage at an earlier time.

It may be fairly stated that except for occasional part time work, the only occupation of all of the appellees was that of ranching and had been so for many years. For example, Robert G. Nance, Jr. testified

that in the operation of his place, he worked from seven in the morning until sometimes nine o'clock in the evening, six days a week, and, if needful, on Sunday as well. Charles R. Williams, speaking of the time he spent working on the ranch, stated, "All the time. Whatever there is to be done, day or night, it is done."

Several of the appellees have lived all of their lives on their ranches. Robert G. Nance, Jr., for example, never lived on any other place, "but out there." Others came to their places more recently, as C. M. Decker, who moved to his ranch in 1953.

Through the pages of the record one may follow the hard-scrabble tasks of the hill country agriculturalist. The activities of Otto A. Stoepler are fairly typical. His ranch is on Purgatory Creek and, as he described, has plenty of adobe soil and is "pretty rocky." He spends his days plowing, planting, repairing fences, cutting cedar, caring for his livestock, and killing spine cactus, devil pincushions, and horehound.

Other jobs which occupy Stoepler's time are repairing "chugey" roads, fixing windmills, and water gaps. A perennial job for all appellees, who cultivate fields, seems to be hauling rocks from the fields. Stoepler said that he had removed rocks from his field for a lifetime and in this connection, presumably tongue in cheek, claimed, "You can plow your land and the rocks will come up. Where they come from, I don't know. I haul every year. I haul rocks out of my fields."

In the court's charge the jury was instructed, among other things, that:

"You are instructed that the term 'agricultural use,' as used in this charge, means the raising of livestock or growing of crops, fruit, flowers, and other products of the soil under natural conditions as a business venture for profit, which business is the primary occupation and source of income of the owner.

You are instructed that the term 'income,' as used in this charge, means that which comes in or is received from any occupation or business venture or investment of capital without reference to the outgoing expenditures.

You are instructed that the term 'develop,' as used in this charge, means the continuation of the work in hand and the promotion of its production; to unfold more completely; to further, and to promote the growth of.

You are instructed that the term 'primary,' as used in this charge, means principal; chief; and greater portion of.

You are instructed that the term 'continuous,' as used in this charge, means uninterrupted; unbroken, connected; extended, or so persistently repeated at short intervals as to constitute virtually an unbroken series.

You are instructed that the term 'raising of livestock,' as used in this charge, is not limited to only those livestock which are born on the lands in question.

In consideration of the following Special Issues with respect to each of the respective landowners, you shall consider each owner and his (or her) land, and the evidence pertaining thereto, separately and apart from the evidence pertaining to the other owners and their land."

The case was submitted to the jury upon twenty two special issues, to all of which the jury answered, "We do."

For purposes of this appeal, it may be said that two special issues were directed to the agricultural development and use of each appellee's lands. The form of those special issues and instructions follows:

"SPECIAL ISSUE NO. ─────

Do you find from a preponderance of the evidence that between January 1, 1964, and January 1, 1971,

—————'s ————— acres of land were continuously developed for agriculture as those terms are herein defined?

Answer 'We do' or 'We do not.'

SPECIAL ISSUE NO. —————

Do you find from a preponderance of the evidence that between January 1, 1964, and January 1, 1971, —————'s ————— acres of land were devoted exclusively for agricultural use as that term is defined herein?

Answer 'We do' or 'We do not.'

In connection with the foregoing Special Issue No. ——, in determining "exclusive agricultural use', you are instructed that you shall not consider, for any purposes, the following:

(a) The leasing of such land for hunting purposes; or

(b) The receipt by the owner of delay rentals or bonuses from non-producing oil and gas leases on such lands; or

(c) The use by the owner, or his relatives, of a portion of the land for residential purposes; or

(d) The receipt by the owner of any annuities, retirement income, pensions, social security payments, or old age assistance."

Although appellants attack the judgment by eighty-two points of error[5] the main questions involve the construction and application of the constitutional amendment. By many points,[6] appellants contend under the amendment that:

(1) Appellees' lands have not been used exclusively for agricultural purposes;

(2) Agricultural operations have not been the primary source of income of the appellees for at least three successive years immediately preceding the assessment date; or,

(3) Appellees' lands have not been continuously developed for agriculture for at least three successive years immediately preceding the assessment date for each of the years in question.

■ With respect to the first contention, appellants claim, as a matter of law, that appellees' lands have not been used exclusively for agricultural purposes, since, in case of most, appellees leased their ranches for deer hunting. Appellants contend that leasing the land for deer hunting is not an "agricultural use", and hence those lands, once so leased, have not been used *exclusively* for "agricultural use." By devoting their lands to purposes other than agricultural, so say appellants, appellees have destroyed their eligibility to have their land assessed by the standards of the amendment.

In Klitgaard v. Gaines, 479 S.W.2d 765, 769 (Tex.Civ.App.1972, writ ref'd n.r.e.) this Court held " . . . that both deer leases and grass leases involved the utilization of the resources of the land for profit, and that both constitute 'agricultural uses' of the land within the meaning of the amendment."

With respect to their second contention, that agricultural operations have not been the primary source of income of the appellees, appellants insist that the amendment must be construed strictly, and that the proper test is " . . . that all income of

5. The trial of the case took about one month. The statement of facts fills seven volumes and 2814 pages. There are three volumes of exhibits. In their motion for new trial, appellants levelled 176 assignments of error and about 239 sub-assignments of error.

6. These contentions were raised by no evidence and insufficient evidence complaints; by motion for judgment *non obstante veredicto;* by motion to disregard findings of the jury; and by objections to definitions and special instructions in the charge.

every type, except that derived from the operation of the land sought to be assessed for the raising of livestock or the growing of crops, fruits, flowers, and other products of the soil under natural conditions must be accumulated on one side and compared with the income from that land owned by the persons in question which is used for raising of livestock or growing of crops, fruits, flowers and other products of the soil, and if the income from all other sources is larger than that from the raising of livestock or growing of crops, fruits, flowers, and other products of the soil under natural conditions, then agricultural use is not a primary source of income of the owner."

The tax collector in Klitgaard v. Gaines, *supra*, advanced a criterion for eligibility under the amendment similar to that of appellants. In rejecting the tax collector's position in that case, this Court said:

"Eligibility for the benefits of the amendment is not to be determined by the vagaries of nature or the market, nor by fortuitous investment or inheritance. But rather to qualify under the amendment one must be engaged in a bona fide effort to earn a profit from the land by agricultural operations. To this end the appellees devoted all of their efforts and realized substantial sums each year from the sale of cattle, hogs, pecans, and leases for grass and deer hunting, all involving the utilization of the resources of the land for profit."

■ Appellants would require that before certain of the appellees could qualify under the amendment, those appellees would have to forego social security and other retirement benefits to which they were entitled as a matter of right. We are of the opinion that appellants' position is untenable. The intent of the amendment is to benefit those persons who gain, or at-

tempt to gain, their livelihood directly from the land by farming or ranching; and persons, who otherwise qualify, are not rendered ineligible under the amendment by receiving social security or other retirement benefits.

■ An examination of the record reveals that all of the appellees have spent their years, their strength, and their substance, wresting a yield from the stubborn soil.[7] And in so doing, appellees realized substantial sums each year from the sale of cattle, goats, cedar posts, mohair, leases for deer hunting, and grass leases, all involving the utilization of the resources of the land for profit. Appellees are now, and, indeed, have been for many years, bona fide agriculturalists who have sought to earn their sustenance from the land, and, as such, come within the ambit of the amendment. They have discharged their burden under the amendment by showing that their primary occupation and source of income was the agricultural use of their lands.

■ As we have held that appellees have shown that their primary occupation and source of income was the agricultural use of the land, it is unnecessary to treat of appellants' third contention that under Sec. 1-d(e) appellees did not show that their lands had been continuously developed for agriculture for at least three years.

■ Other points of error complain of practically every definition in the court's charge including, "income", "development", "primary", "other products of the soil", "raising of livestock." In general, appellants complain that these terms were not technical terms and did not require definitions. Appellants also urge that the definitions given were erroneous and constituted a comment on the weight of the evidence.

7. Charles R. Williams could well have been speaking for all of the appellees when he said, in response to an inquiry as to what

he did for a living in 1964, "I lived on that ranch. That was my income, my life, and everything. Still is."

In the context of the record, the definitions included in the charge were correct, and properly given pursuant to Texas Rules of Civil Procedure 277. Although the terms are common ones, each assumed a particular significance in the light of this record and were necessary for the application of the facts by the jury to the special issues.

■ Appellants also complain of the special instructions following each cluster of issues as to those items not to be considered in determining "exclusive agricultural use." As may be seen by an examination of the instructions those items not to be considered by the jury were the leasing of the lands for hunting purposes, the receipt by the landowners of delay rentals or bonuses from non-producing oil and gas leases on the lands, the use by the owner of his relatives of a portion of the land for residential purposes, and the receipt by the owner of any annuities, retirement income, pensions, social security payments, or old age assistance. With respect to the special issue inquiring of the lands of C. M. Decker, the jury was specially instructed not to consider the receipt by the owner, or his spouse, of any inheritance, or proceeds therefrom. In connection with the special issue concerning the lands of L. R. Calhoun the jury was specially instructed that "other products of the soil" would include trees naturally seeded and grown on the soil under natural conditions.

There is no error in the instruction as to those items not to be considered in determining "exclusive agricultural use." We have previously held that persons, who otherwise qualify, are not rendered ineligible under the amendment by receipt of social security or other retirement benefits. Save for the instruction concerning the use of a portion of the land for residential purposes, the other items were permissibly included in the charge under the authority of Klitgaard v. Gaines, *supra.*

■ We do not regard the instruction concerning the use of a portion of the land for residential purposes to be in conflict with King v. Real, 466 S.W.2d 1 (Tex. Civ.App.1971, writ ref. n.r.e.). In that case it was determined that it was improper to require the tax collector to value the ranch residence as a part of the agricultural use value. King v. Real, *supra,* indicates that ranch residences should be assessed separately from the ranch land. The instruction in question had nothing to do with value per se, but simply directed the jury that they were not to consider the use of a small portion of the ranch land belonging to appellees for residential purposes in making the determination whether or not the land was being used exclusively for agriculture.

■ By their twenty-fourth through forty-fifth points of error, appellants' charge that the court erred in submitting each special issue for the reason that (1) there was no evidence to submit its submission of each, and (2) there were no pleadings to support its submission. At an earlier point in this opinion the no evidence points were considered. With respect to the second complaint, appellees' pleadings were sufficient to support the submission of the issues.

Appellants seem to argue that it was necessary for appellees in their trial pleadings to allege in the terms ultimately employed in the special issues. Appellees' alleged generally that their lands had been designated for agricultural use in accordance with the provision of the amendment and that they had qualified their lands as designated for agricultural use as required by the amendment. Although perhaps the appellees could have been more explicit in their trial pleadings, we are quite certain that appellants, and the court, were amply apprised of appellees' grounds for recovery, and that appellants were not harmed in the presentation of their case by the state of the pleadings.

In eighteen points of error appellants say that the court erred in overruling their special exceptions to the appellees' trial

pleading. Some special exceptions were directed to the claimed failure of the appellees adequately to allege and describe their lands, and to allege specific facts which would support their general allegations that they were entitled to have their lands valued on the basis of agricultural use. Other special exceptions asserted a failure of the appellees to allege "what the statements and reasons they had advanced in support of . . ." their position. More special exceptions pointed out the failure of appellees to allege facts to show why the fair market value was not the proper criterion, and, finally, appellants by special exception complained of the failure of appellees to allege what the value of their lands was for agricultural use.

■ None of these points is meritorious. It has long been the law that parties are not required to plead evidence, Wells v. Fairbanks, 5 Tex. 581 (1851). What was said before in the disposition of appellants' contention concerning the absence of pleading to permit the submission of the special issues is equally applicable to this group of points.

■ Appellants' sixty fourth point of error is that the court erred in overruling their "Plea of Misjoinder of Parties and Actions."

Tex.R.Civ.P. 40(a) provides in part:

"All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurence, or series of transactions or occurences and if any question of law or fact common to all of them will arise in the action."

Rule 40 follows Federal Rule 20 which, in turn, was based upon liberal rules found in a number of the states. It has been said that the theory of Rule 40 is that "questions of permissive party joinder shall be handled as a matter of trial convenience, allowing litigants virtually unlimited freedom to bring controversies before the court so long as they are sufficiently interrelated to justify prima facie their consideration in a single action, and to leave to the judge, armed with the power to direct severances or separate hearings and trials when desirable, the regulation of the manner of actual trial." I McDonald, Texas Civil Practice § 3.18–C, (Rev. Vol. 1965).

The matter of granting appellants' motion was one within the discretion of the trial court, Hindman v. Texas Lime Company, 157 Tex. 592, 305 S.W.2d 947 (Tex. 1957), and from an examination of the trial pleadings we are not convinced that the trial court abused its discretion in refusing to sever the respective causes of action of appellees.

Appellants devote seventeen points of error to the claimed error of the court in the admission of evidence. Each point is based upon an assignment of error in the motion for new trial which in turn is broken into sub-assignments. The various reasons given in the sub-assignments of error are advanced as reasons for reversal. We have considered the points in this group and find them to be without merit.

■ Some of the appellees rendered their lands for the years involved with the taxing authorities, while others did not. In the judgment the taxing authorities were required to assess the lands upon the rendered values placed thereon by those several appellees.

Vernon's Tex.Rev.Civ.Stat.Ann. art. 7346 gives taxing agencies, when any assessment has been invalid for any reason by a district court in "a suit to enforce the collection of taxes", the right to re-assess the property in question. See Electra Independent School Dist. v. W. T. Waggoner Estate, 140 Tex. 483, 168 S.W.2d 645 (Tex.1943).

The same treatment has been recently accorded to suits to *enjoin* the assessment of taxes in which taxing authorities filed cross-actions for the collection of taxes due. Seguin Independent School District

v. Blumberg, 402 S.W.2d 552 (Tex.Civ. App.1966, writ ref'd n.r.e.), King v. Turtle Creek Ranches, Inc., 454 S.W.2d 795 (Tex.Civ.App., 1970, no writ).

Whether suits to enjoin assessments should be governed by the provisions of art. 7346 is not free from doubt.[8] We have, however, concluded that the disposition of this point should be governed by Seguin, *supra,* and King, *supra.*

The judgment will be reformed to provide that the taxing authorities are mandatorily enjoined to re-assess the lands of *all* of the appellees for all tax purposes on the consideration of only those factors relative to such agricultural use of the lands as provided and required by Article 8 § 1–d(a) of the Constitution of Texas. In all other respects the judgment is affirmed.

Reformed, and as reformed, affirmed.

---

8. In Seguin, *supra,* Justice Cadena, *addressing himself to the inadvisability of* a different treatment for suits to enjoin invalid assessments and for suits to collect taxes due, said,
   "To permit reassessment by the taxing agencies in this case would work no greater hardship on the taxpayer than does the rule, approved by the Supreme Court, which allows such reassessment where the suit is one for the collection of delinquent taxes. There is nothing inherent in the nature of an injunction suit which compels giving to the rendition a finality and conclusiveness which it does not enjoy in a suit for the collection of taxes."