**HL FARM CORPORATION, Petitioner,**

v.

**Jackie SELF, Chief Appraiser–Kaufman County Single Appraisal District et al., Respondents.**

No. D–1794.

Supreme Court of Texas.

May 11, 1994.

Dissenting Opinion by Justice Doggett Feb. 9, 1994.

Harold R. McKeever and Kevin J. Cook, Dallas, G. Walter McCool, Popp & Ikard, Austin, for petitioner.

Gil J. Altom, Joe M. Parnell and Louis N. Conradt, Jr., Kaufman, Peter W. Low and Bill Kimbrough, Austin, for respondents.

HIGHTOWER, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, HECHT, CORNYN, GAMMAGE and SPECTOR, Justices, join.

We grant Petitioner's motion for rehearing, overrule Respondents' motion for rehearing, withdraw our prior opinion and judgment, and substitute the following in its place.

This case presents the issue whether section 23.56(3) of the Texas Tax Code violates section 3 of article I of the Texas Constitution because it impermissibly discriminates against a Virginia corporation whose majority interest is owned by a nonresident alien. H.L. Farm Corporation (H.L. Farm) filed this action contesting the Kaufman County Appraisal District's (Appraisal District) denial of its application for an open space land designation. The trial court granted summary judgment for the Appraisal District. The court of appeals affirmed. 820 S.W.2d 372. We reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings.

## I.

H.L. Farm [1] is a Virginia corporation authorized to do business in Texas. H.L. Farm is owned by Liebherr–America, Inc., which is also a Virginia corporation and a subsidiary of Liebherr International, AG, a Switzerland corporation.[2] H.L. Farm owns land in Kaufman County. H.L. Farm applied for an open-space land designation pursuant to section 23.54 of the Texas Tax Code. *See* Tex. Tax Code § 23.54. This designation provides for reduced tax valuation for open-space land. *See* Tex.Tax Code §§ 23.52–3. However, there are limits on the eligibility of certain owners of open-space land to qualify for the reduced tax valuation. Section 23.-56(3) sets out the eligibility limitation which affects H.L. Farm:

### § 23.56. Land Ineligible for Appraisal as Open–Space Land

Land is not eligible for appraisal as provided by this subchapter if:

. . . .

(3) the land is owned by a corporation, partnership, trust, or other legal entity if the entity is required by federal law or by rule adopted pursuant to federal law [3] to register its ownership or acquisition of that land and a nonresident alien or a foreign government or any combination of nonresident aliens and foreign governments own a majority interest in the entity.

---

1. H.L. Farm is required by the Agricultural Foreign Investment Disclosure Act to register its ownership and acquisition of land with the United States Secretary of Agriculture. 7 U.S.C. § 3501.

2. Liebherr International, AG, is a nonresident alien.

3. The Agricultural Foreign Investment Disclosure Act requires all foreign persons to register their ownership of land in the United States. 7 U.S.C. § 3508(3)(C). H.L. Farm is a foreign person as defined in this statute.

TEX.TAX CODE § 23.56(3) (footnote added). Based on section 23.56(3), the Appraisal District denied H.L. Farm's application for open-space land designation.

H.L. Farm filed suit against the Appraisal District alleging that section 23.56(3) violated various provisions of the Texas and United States Constitutions. The trial court upheld the constitutionality of section 23.56(3) and granted summary judgment for the Appraisal District. The court of appeals affirmed, holding that the statute did not violate either the Texas or United States Constitutions.

## II.

■ H.L. Farm argues that section 23.56(3) violates section 3 of article I of the Texas Constitution because it impermissibly discriminates against a Virginia corporation whose majority interest is owned by a nonresident alien. We agree.

■ H.L. Farm asserts that section 23.56(3) violates various provisions of the Texas and United States Constitutions; however, we will examine our own Texas Constitution first to determine this question. *See Davenport v. Garcia*, 834 S.W.2d 4, 11–13 (Tex. 1992). Equal protection is afforded by two distinct provisions of the Texas Constitution. *See* TEX. CONST. art. I, §§ 3, 3a. Section 3 provides that "[a]ll free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services."[4] TEX. CONST. art. 1, § 3.

■ When a court reviews the constitutionality of a statute, it presumes that the statute is valid. *Spring Branch Indep. School Dist. v. Stamos*, 695 S.W.2d 556, 558 (Tex.1985); *Whitworth v. Bynum*, 699 S.W.2d 194, 197 (Tex.1985). If interests other than fundamental rights or a suspect classification are affected, the classification must be rationally related to a legitimate state interest. *Whitworth v. Bynum*, 699 S.W.2d at 197 ("Even when the purpose of a statute

is legitimate, equal protection analysis ... requires a determination that the classifications drawn by the statute are rationally related to the statute's purpose."); *Sullivan v. University Interscholastic League*, 616 S.W.2d 170, 172 (Tex.1981). H.L. Farm does not assert that fundamental rights or a suspect classification are affected; consequently, we will apply the rational basis test. In doing so, we must determine whether the classification created in section 23.56(3) for eligibility for appraisal for open space land—ownership by a corporation that is required by federal law or rule to register its ownership or acquisition of land and whose majority interest is owned by a nonresident alien and/or a foreign government—is rationally related to the purpose of section 23.51 *et seq.* First, however, we must determine the purpose of section 23.51 *et seq.*

## III.

In 1966, section 1–d of article VIII of the Texas Constitution was adopted. Section 1–d states in pertinent part:

(a) All land owned by natural persons which is designated for agricultural use in accordance with the provisions of this Section shall be assessed for all tax purposes on the consideration of only those factors relative to such agricultural use. "Agricultural use" means the raising of livestock or growing of crops, fruit, flowers, and other products of the soil under natural conditions as a business venture for profit, which business is the primary occupation and source of income of the owner.

Tex. Const. art. VIII, § 1–d(a). Sections 23.41–46 of the Texas Tax Code were enacted pursuant to section 1–d.

In *Gragg v. Cayuga Indep. School Dist.*, 539 S.W.2d 861 (Tex.1976), we inquired into the purpose of section 1–d, concentrating on the phrase "primary occupation and source of income of the owner." We stated that section 1–d was enacted for the purpose of relieving the tax burden of bona fide farmers and ranchers who depend upon the soil for

---

4. Despite its gender specific language, i.e. "men," this provision applies to business entities, such as corporations, as well as to natural persons. *See Prudential Health Care Plan, Inc. v.*

*Comm. of Ins.*, 626 S.W.2d 822, 832 n. 10 (Tex. App.—Austin 1981, writ ref'd n.r.e.); *Beaumont Traction Co. v. State*, 57 Tex.Civ.App. 605, 122 S.W. 615, 617 (1909, no writ).

their livelihoods. *Id.* at 867–68. We further stated:

It is obvious that the Texas "primary occupation and source of income" requirement was intended to prevent the lower agricultural assessment from being abused by allowing land investors and speculators to reduce their assessments and taxes simply by planting a crop or running livestock on the land. The provision also has the salutary purpose of encouraging not only that agricultural and ranch land be continued in production but that farmers and ranchers remain in the business of such production.

*Id.* at 865.

In 1978, section 1–d–1 of article VIII of the Texas Constitution was adopted. Section 1–d–1 states:

(a) To promote the preservation of open-space land, the legislature shall provide by general law for taxation of open-space land devoted to farm or ranch purposes on the basis of its productive capacity and may provide by general law for taxation of open-space land devoted to timber production on the basis of its productive capacity. The legislature by general law may pro-

vide eligibility limitations under this section and may impose sanctions in furtherance of the taxation policy of this section.

(b) If a property owner qualifies his land for designation for agricultural use under Section 1–d of this article, the land is subject to the provision of Section 1–d for the year in which the designation is effective and is not subject to a law enacted under this Section 1–d–1 in that year.

Tex. Const. art. VIII, § 1–d–1. Sections 23.51 *et seq.* were enacted pursuant to section 1–d–1. Section 1–d–1 did not supersede section 1–d.[5]

In *Alexander Ranch, Inc. v. Central Appraisal Dist.*, 733 S.W.2d 303 (Tex.App.—Eastland 1987, writ ref'd n.r.e.), the court of appeals considered whether section 23.56(3) violated the equal protection clause of the fourteenth amendment to the United States Constitution by excluding from appraisal as open-space land real property owned by two Texas corporations controlled by a nonresident alien. Citing *Gragg v. Cayuga Indep. School Dist.*, 539 S.W.2d 861 (Tex.1976) and *San Marcos Consolidated Indep. School Dist. v. Nance*, 495 S.W.2d 335 (Tex.Civ. App.—Austin), writ ref'd n.r.e. per curiam,

---

5. Essentially two distinct valuation schemes were created—"agricultural use" and "open-space land." "Agricultural use" valuation is governed by section 1–d of the Texas Constitution and sections 23.41–46 of the Texas Tax Code. "Land designated for agricultural use is appraised at its value based on the land's capacity to produce agricultural products." Tex.Tax Code § 23.-41(a). An owner of land is eligible for "agricultural use" valuation if (1) "the land has been devoted exclusively to or developed continuously for agriculture for the three years preceding the current year", (2) "he is using and intends to use the land for agriculture as an occupation or a business venture for profit during the current year" and (3) "agriculture is his primary occupation and primary source of income." Tex.Tax Code § 23.42. "If land that has been designated for agricultural use in any year is sold or diverted to a nonagricultural use, the total amount of additional taxes for the three years preceding the year in which the land is sold or diverted plus interest at the rate provided for delinquent taxes becomes due." Tex.Tax Code § 23.46(c).

"Open-space land" valuation is governed by section 1–d–1 of the Texas Constitution and sections 23.51–57 of the Texas Tax Code. "Open-space land" includes "land that is currently devoted principally to agricultural use to the degree

of intensity generally accepted in the area and that has been devoted principally to agricultural use or to production of timber or forest products for five of the preceding seven years or land that is used principally as an ecological laboratory by a public or private college or university." Tex. Tax Code § 23.51(1). For the purposes of "open-space land," "agricultural use" includes "cultivating the soil, producing crops for human food, animal feed, or planting seed or for the production of fibers; floriculture, viticulture, and horticulture; raising or keeping livestock; raising or keeping exotic animals for the production of human food or of fiber, leather, pelts, or other tangible products having a commercial value; and planting cover crops or leaving land idle for the purpose of participating in any governmental program or normal crop or livestock rotation procedure." Tex.Tax Code § 23.51(2). "If the use of the land ... changes, an additional tax is imposed on the land equal to the difference between the taxes imposed on the land for each of the five years preceding the year in which of use occurs that the land was appraised as provided by this subchapter and the tax that would have been imposed had the land been taxed on the basis of market value in each of those years, plus interest...." Tex.Tax Code § 23.55(a). *See generally Gifford–Hill & Co., Inc. v. Wise County Appraisal Dist.*, 827 S.W.2d 811 (Tex.1991).

502 S.W.2d 694 (Tex.1973), the court stated that "[i]t is apparent that the purpose of the open-space exemption in Section 23.51 *et seq.* is to preserve and benefit the family farm." *Id.* at 307. However, *Gragg* and *San Marcos Consolidated Indep. School Dist.* involved section 1–d of the Texas Constitution concerning agricultural valuation and *not* section 1–d–1 and sections 23.51 *et seq.* concerning the open-space land valuation. Consequently, the court of appeals erroneously determined the purpose of section 1–d–1 and sections 23.51 *et seq.* concerning the open-space land valuation. In *Riess v. Williamson Cty. Appraisal Dist.,* 735 S.W.2d 633 (Tex.App.—Austin 1987, writ denied), the court of appeals reviewed the denial of an open-space land valuation based upon the degree of agricultural use generally accepted in the area. Concerning the purpose of section 1–d–1, the court stated:

> It appears to this Court that § 1–d–1 expresses two policies to be achieved by the legislature in appraising farm and ranch land: (1) preserve "open-space land"; and (2) provide for taxation on the basis of the land's "productive capacity."

*Id.* at 637. In *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820 (Tex.1993), we recognized that "[t]he Texas Constitution promotes the preservation of open-space land by authorizing the legislature to tax open-space land devoted to farm or ranch purposes on the basis of its productive capacity." *Id.* at 821. We conclude that the purpose of section 1–d–1 and sections 23.51 *et seq.* is to promote the preservation of open-space land devoted to farm or ranch purposes.

### IV.

Next we consider whether the classification created in section 23.56(3) is rationally related to the purpose of section 23.51 *et seq.* The classification created in section 23.56(3) is based upon ownership by a corporation that is required by federal law or rule to register its ownership or acquisition of land and whose majority interest is owned by a nonresident alien and/or a foreign government. The purpose of section 23.51 *et seq.* is to promote the preservation of open-space land devoted to farm or ranch purposes. Preservation of open-space land is based upon use, not ownership.

Any individual or legal entity, foreign or domestic, may own property and contribute to the preservation of open-space land by utilizing the land for agricultural use to the degree of intensity generally accepted in the area. A "foreign corporation" owned by a nonresident alien may contribute to the preservation of open-space land as well as any Texas individual or legal entity. However, under section 23.56(3), if H.L. Farm sold its property in Kaufman County to another Virginia corporation which was not owned by a nonresident alien, the new owner would qualify for the open-space land designation while H.L. Farm would not. In fact, under section 23.56(3), if the majority interest of a Texas corporation was owned by a nonresident alien, it would not qualify for an open-space land designation. No rational basis exists for denying an open-space land designation to H.L. Farm, a "foreign corporation" owned by a nonresident alien. We conclude that the classification drawn by section 23.56(3) is not rationally related to the promotion and preservation of open-space land. Consequently, we hold that section 23.56(3) of the Texas Tax Code violates section 3 of article I of the Texas Constitution.[6] To the extent that it conflicts with this opinion, we disapprove *Alexander Ranch v. Central Appraisal Dist.,* 733 S.W.2d 303 (Tex.App.—Eastland 1987, writ ref'd n.r.e.).

We reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings.

Feb. 9, 1994

DOGGETT, Justice, dissenting.

None but fools and poor men ever pay taxes in Texas!

---

6. Because we have determined that section 23.56(3) violates section 3 of Article I of the Texas Constitution, it is not necessary to consider whether section 23.56(3) violates the United States Constitution or other provisions of the Texas Constitution.

—complaint heard at the 1875 Constitutional Convention [1]

[We] intended to promote only actual settlement of our magnificent State, by hardy tillers of the soil.... It was never intended by the framers of our Constitution that our people should become tenants at will of foreign princes or nobility, and divested of that independence of character which has made the name of Texan a representative of that indomitable courage which does not grow up at the firesides of a pauper peasantry, controlled by a rich landed proprietary.

—Charles De Morse, Chairman of the Taxation Committee, Constitutional Convention of 1875.[2]

In a strange quirk, contrary to this heritage, the Court has concluded that our Texas Constitution mandates Texas taxpayers to subsidize a Swiss corporation. Because the challenged tax statute rationally furthers the legitimate goal of protecting the family farm and discouraging ownership of Texas farmland by nonresident aliens, and because our State should be empowered to place some rational limitations on massive tax expenditures by deciding not to bestow on residents of foreign countries the same benefits it bestows on Texans, I dissent.

The Court has properly reinforced the differences between the equal protection guarantees of section 3, article I of the Texas Constitution and of the Fourteenth Amendment to the United States Constitution. Under federal analysis, statutory discrimination will not be set aside as the denial of equal protection of the laws, if any state of facts reasonably may be conceived to justify it. *Sullivan v. Stroop*, 496 U.S. 478, 485, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990); *Metropolitan Casualty Ins. Co. v. Brownell*, 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed.

1070 (1935). It is irrelevant as to whether the justifications courts may hypothesize as a rational basis "in fact underlay the legislative decision." *United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980) (quoting *Flemming v. Nestor*, 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)); *see Allied Stores v. Bowers*, 358 U.S. 522, 527–28, 79 S.Ct. 437, 440–41, 3 L.Ed.2d 480 (1959). "The problems of government are practical ones and may justify, if they do not require, rough accommodations [though] illogical, it may be, and unscientific." *Bowen v. Gilliard*, 483 U.S. 587, 601, 107 S.Ct. 3008, 3017, 97 L.Ed.2d 485 (1987) (quoting *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913)).

This extremely deferential federal rational basis test "allows government to discriminate among classes of people for the most whimsical of reasons." *Butte Community Union v. Lewis*, 219 Mont. 426, 712 P.2d 1309, 1314 (1986). Since "[a]lmost all legislative distinctions will withstand this level of scrutiny," *Lucas v. United States*, 757 S.W.2d 687, 704 (Tex.1988) (Phillips, C.J., dissenting), legislation is seldom invalidated on equal protection grounds. *See also* Gerald Gunther, *The Supreme Court 1971 Term, Foreward: In Search of an Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 HARV.L.REV. 1, 8 (1972) (Federal rational basis is "minimal scrutiny in theory and virtually none in fact.").

Unlike this federal standard, Texas permits a court to look beyond the stated rationale for legislation and to examine its true factual basis. *See, e.g., Texas Woman's Univ. v. Chayklintaste*, 530 S.W.2d 927, 928 (Tex.1975) (upholding rule after reviewing uncontradicted expert testimony and analysis contained in professional journals as to its rationality and efficacy); *Humble Oil & Re-*

---

1. Delegate B.D. Martin attributed this statement to "a noted ex-judge of this State [who] pays but a small amount of taxes." SETH S. McKAY, DEBATES IN THE TEXAS CONSTITUTIONAL CONVENTION OF 1875 306 (1920). This was also the rejoinder of delegate C. Erhard to a proposal by delegate John Reagan to benefit "all those who owned

[property through Mexican and Spanish land grants] and had paid taxes on them." Fred Cockrell, *The Making of the Constitution of 1875*, 5 WEST TEX.HIST.ASS'N YRBK 107, 110 (1929). ("Taxes! Taxes! Nobody but a fool and poor men pay taxes!")

2. CHARLES DE MORSE, SUPPLEMENTAL REPORT OF THE BOARD FOR THE INVESTIGATION OF LAND FRAUDS IN THE STATE OF TEXAS 9–11 (Jan. 3, 1884).

*fining Co. v. City of Georgetown,* 428 S.W.2d 405 (Tex.Civ.App.—Austin 1968, no writ) (overturning ordinance limiting size of gasoline delivery trucks by considering actual economic consequences and relying on expert's testimony that the regulation did not promote safety). *See also Glen Oaks Utilities, Inc. v. City of Houston,* 161 Tex. 417, 340 S.W.2d 783, 784 (1960) ("Justice requires that a court must have authority to go behind an ordinance which is valid on its face and inquire into the facts surrounding its enactment."). *Compare* Cass R. Sunstein, *Interest Groups in American Public Law,* 38 STAN.L.REV. 29, 69 (1985) (urging a more demanding federal rational basis test).

Using the level of scrutiny applied under the "Texas rational basis test," *Whitworth v. Bynum,* 699 S.W.2d 194 (Tex.1985), a contested classification is examined to ascertain whether it has "a fair and substantial relation to the object of the legislation." *Chayklintaste,* 530 S.W.2d at 929 (adopting the medium tier scrutiny used in *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971)); *see City of Coleman v. Rhone,* 222 S.W.2d 646, 649 (Tex.Civ.App. Eastland—1949, writ ref'd); *Dodgen v. Depuglio,* 146 Tex. 538, 209 S.W.2d 588, 594 (1948); *Fort Worth & D.C. Ry. Co. v. Welch,* 183 S.W.2d 730, 735 (Tex.Civ.App.—Amarillo 1944, writ ref'd); *Taylor v. State,* 513 S.W.2d 549, 552 (Tex.Crim.App.1974); *Aladdin's Castle, Inc. v. City of Mesquite,* 713 F.2d 137, 138 n. 2 (5th Cir.1983).

That this Court has now struck down the challenged tax provision shows how much less deferential the Texas test is than its federal counterpart. This very tax statute was earlier upheld under the federal equal protection clause. *Alexander Ranch, Inc. v. Central Appraisal Dist.,* 733 S.W.2d 303, 307 (Tex.App.—Eastland 1987, writ ref'd n.r.e.), *cert. denied,* 486 U.S. 1026, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988). *Compare Whitworth,* 699 S.W.2d at 195–96 (acknowledging that *Silver v. Silver,* 280 U.S. 117, 50 S.Ct. 57, 74 L.Ed. 221 (1929), *Campbell v. Paschall,* 132 Tex. 226, 121 S.W.2d 593 (Comm'n App.1938), and *Tisko v. Harrison,* 500 S.W.2d 565 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.), sustained, under the different

and less exacting federal rational basis test, the guest statute struck down under the Texas rational basis test).

While here quite properly turning first to our Texas Constitution and its independent, nondeferential review, the court has, nevertheless, erred by failing to recognize the underlying rationality of the questioned tax provision. Section 23.56 of the Texas Tax Code, like much other legislation, serves multiple purposes. Courts are not authorized

> to pick and choose among legitimate legislative aims to determine which is primary and which is subordinate.... So long as the state purpose in upholding a statutory class is legitimate and nonillusory, its lack of primacy is not disqualifying....
>
> Legislation is often multipurposed: the removal of even a "subordinate" purpose may shift altogether the consensus of legislative judgment supporting the statute.

*McGinnis v. Royster,* 410 U.S. 263, 276–77, 93 S.Ct. 1055, 1062–63, 35 L.Ed.2d 282 (1973), *cited in Chayklintaste,* 530 S.W.2d at 928.

In striking a provision simply because it allegedly fails rationally to advance the goal of promoting the preservation of open space, the Court disregards other legitimate and complementary goals as described during legislative consideration:

> Farmers need tax releif [sic]; this bill delivers it. [Its] provisions are fair to farmers, other local residents, and the state. The bill will help keep small farms in production and will help the state's economy.
>
> The ownership restrictions in the bill are fair. Foreign land speculators have no interest in farming the land. They are only concerned with profiting from the inflationary increase in land costs. Their investments in Texas land drive up costs even more, which hurts our own farmers and increases food prices. Foreigners should not receive a tax break.... The purpose of this bill is to keep farmland in production.

HOUSE STUDY GROUP, BILL ANALYSIS OF H.B. 1060 at 5, 66th Leg., R.S. (March 12, 1979). These goals of keeping farmland production

free of speculative ownership by nonresident aliens and operational by the family farmer are rationally furthered by the exclusion of corporations owned by nonresident aliens.

Similar goals have long been firmly embedded in the Texas Constitution. As originally framed in 1875, article VIII, section 1 sought to prevent both state and local governments from granting tax breaks to foreign corporations. In the strong words of the Convention's Committee on Revenue and Taxation Chairman:

> [O]n the article of taxation began the contest between corporate interests and the masses of the people and the rights of those masses. [T]he question was whether the people were properly represented, and whether corporate interests should control the Convention as they had controlled Legislatures for the past three or four years. The committee had carefully considered every proposition on taxation, and had endeavored to reach every class that had thitherto avoided taxation.

SETH S. McKAY, DEBATES IN THE CONSTITUTIONAL CONVENTION OF 1875 296 (1920) (statement of Charles DeMorse). An equally strident delegate B.D. Martin declared:

> [T]here are now 35,000,000 acres of patented lands in the State, not rendered and on which the owners pay no taxes; and in addition to this there is a very great under valuation of the property of railroad companies and other corporations; for instance, the Pullman Palace Car Company render only $56,000 worth of property, while they own about $200,000.
>
> The Houston & Texas Central Railway Company owns 501 miles of road which they render at $11,500 per mile, while it is worth at least $30,000 per mile, by which the State loses ... $9,268,500. At this rate the State loses on the 1,650 miles of railroad within her limits the immense sum of $30,525,000 [in taxes].
>
> A distinguished, or rather, a noted ex-judge of this State, a short time ago, declared that "none but fools and poor men ever pay taxes in Texas," and the records at the Comptroller's Office appear to prove the truth of the assertion. He is rich and pays but a small amount of taxes. It is

this class, and these stupendous and over-shadowing corporations, grown insolent over the millions they have wrung from the bone and muscle of the country, who, [should not] be exempted from taxation.

*Id.* at 305–06. The framers, moreover, feared the effects on Texas government and economy should foreign corporations gain ownership of significant portions of Texas land. *See* CHARLES DE MORSE, SUPPLEMENTAL REPORT OF THE BOARD FOR THE INVESTIGATION OF LAND FRAUDS IN THE STATE OF TEXAS 9–11 (Jan. 3, 1884) (interpreting art. XIV).

The antimonopoly and antiperpetuity language of section 26 of Article I has also been said to reflect an intent to discourage ownership of Texas land by foreign interests. Judge Thomas L. Nugent, an influential member of the Bill of Rights Committee which framed this provision, criticized as a "land monopoly" the extensive ownership by foreign syndicates of land used by American tenant farmers. LIFE WORK OF THOMAS L. NUGENT 137, 175 (C. Nugent, ed., 1896). Complaining that in 1893 foreign corporations owned perhaps one-fourth of Texas lands, Governor James Hogg urged enactment of legislation to effectuate section 26, by curtailing the concentration of corporate land ownership. *Message to the 23rd Legislature (Jan. 12, 1893)*, ADDRESSES & STATE PAPERS OF JAMES STEPHEN HOGG 289, 300–304 (Robert C. Cotner, ed., 1951). The Legislature obliged. Act of March 24, 1893, 10 H. GAMMEL LAWS OF TEXAS 466, 23rd Leg., R.S., ch. 38 ("An act to define perpetuities and prevent land monopolies, to limit and regulate the use and ownership of land by corporations"). *See also* James Hogg, *supra*, at 300 ("[L]and corporations can not ... be chartered under the laws of this State.").

The court acknowledges that section 1–d of Article VIII was adopted in 1966 to help preserve the family farm. 877 S.W.2d at 290. In *Gragg v. Cayuga I.S.D.*, 539 S.W.2d 861, 864–65 & n. 2 (Tex.1976), we identified the problem section 1–d was intended to solve:

> For the first one hundred years of its existence, Texas was largely a rural State. By 1965, increased urbanization had

caused increased market values on agricultural lands near metropolitan areas due to industrial expansion, residential subdivisions, and speculative buying. Payment of taxes on market value as required by the constitution of 1876 was discouraging farmers and ranchers from continuing their agricultural uses and was in some instances forcing sales and loss of both land and personnel from the essential business of producing food and fiber.

In 1978, section 1–d–1 was approved to address these same concerns. *See* HOUSE COMM. ON CONSTITUTIONAL AMENDMENTS, BILL ANALYSIS, Tex.H.J.R. 1, 65th Leg., 2nd C.S. (1978). What is now 1–d–1 was originally drafted not as a separate section but as a direct addition to section 1–d. *Id.* Both were designed to aid the family farmer. *See Hearings on H.J.R. No. 1, § 2 Before the House Comm. on Const'l Amendments*, 65th Leg., 2nd C.S. (July 17, 1978) ("the object of the bill is to help the family farmer"). Unlike section 1–d, section 1–d–1 is not self-effectuating [3] but merely grants the Legislature the power "by general law [to] provide eligibility limitations under this section...." Far from being irrational and unconstitutional, the exclusion from tax benefits of nonresident aliens appears to have fulfilled a rather clear constitutional purpose.

Like other tax exemptions, section 23.56(3) represents a governmental choice to accord some taxpayers special treatment over others. Such "exemptions and preferences constitute indirect public subsidies that are every bit as real as the direct expenditure of public monies." *First Baptist Church v. Bexar County*, 833 S.W.2d 108, 118 (Tex.1992) (Mauzy, J., dissenting.) Indeed, the true nature of exemptions as very real tax expenditures has been recognized in section 403.014 of the Texas Government Code, which mandates the Comptroller to report annually on the cost of certain exemptions or tax expenditures. *See* TEX. COMPTROLLER OF PUBLIC ACCOUNTS, A REPORT TO THE GOVERNOR AND TEXAS LEGISLATURE: SALES AND FRANCHISE TAX EXEMPTIONS (1993).[4] Surely then the Legislature should be no more restricted in making a tax expenditure than it would be had it collected the taxes and employed them in a direct expenditure. Here in furthering the goals of preserving open space and the family farm, the State could rationally limit the tax expenditure to Texans and deny it to nonresident aliens.

The decision to extend the "equal rights" guarantee of our Texas Constitution to a Swiss corporation is all the more remarkable in that this case represents this Court's first formal recognition that corporations are afforded any protection under Article I, section 3. As far back as 1894, in *Union Central Life Ins. v. Chowning*, 86 Tex. 654, 26 S.W. 982, 984 (1894), we rejected such a claim brought by a corporation:

> [I]t would be difficult to imagine how a corporation which has no natural rights could be said to be entitled to such rights and privileges as grow out of the formation of a social compact. It is a creature of law, and entitled to such rights as the law grants to it.

A section 3 challenge to a statute that expressly discriminated against corporations was again disapproved in *Sid Westheimer Co. v. Piner*, 263 S.W. 578, 581 (Tex.Comm'n App.1924, judgment adopted):

> [C]orporations, owing their existence to the law, are subject to such regulations and restrictions as the law may place upon them without the necessity of making such laws applicable to natural persons.

The court further relied upon *Prudential Insurance Co. v. Cheek*, 259 U.S. 530, 536, 42 S.Ct. 516, 519, 66 L.Ed. 1044 (1922), for the proposition that:

> [T]he right to conduct business in the form of a corporation ... is not a natural or

---

**3.** Self-effectuating section 1–d incorporates directly into the Constitution language limiting eligibility to "natural persons" whose "primary occupation and source of income" is agriculture.

**4.** The President is also required to enumerate annually federal tax expenditures, 31 U.S.C. § 1105(a)(16) (1982), which are defined as:

Those revenue losses attributable to provisions of the Federal tax laws which allow a special exclusion, exemption, or deduction from gross income or which provide a special credit, a preferential rate of tax, or a deferral of tax liability.

2 U.S.C. § 622(3) (1985).

fundamental right. It is a creature of the law; and a state ... may qualify the privilege by imposing such conditions and duties as reasonably may be deemed expedient, in order that the corporation's activities may not operate to the detriment of the rights of others with whom it may come in contact.

263 S.W. at 581.[5] *Compare Brooks v. State Board of Funeral Directors & Embalmers*, 233 Md. 98, 195 A.2d 728, 733 (1963) (acknowledging that the Maryland equal protection provision may afford corporations less protection than individuals). Not until this writing have *Chowning* and *Piner* been even implicitly questioned. Now they are apparently overruled by footnote without comment or explanation.[6] *See* 877 S.W.2d at 290, n. 4.

By holding that our constitution requires Texas to enroll fully nonresident aliens in programs designed to foster open space, the Court has effectively questioned the legitimacy of other classifications that define who may receive benefits resulting from state expenditures. It would, for example, appear difficult under the Court's reasoning to justify state universities according any preferential treatment to Texas students. Under this approach, nonresident aliens from anywhere in the world would seem entitled to the same tuition rates, scholarships, and other financial aid available to Texas residents. Left similarly vulnerable are statutes, rules, and policy governing purchases by state agencies giving preference to Texas and United States businesses and agricultural and manufacturing products. *See* Tex.Rev.Civ.Stat. art. 601b, § 3.28(a) ("all state agencies making

purchases ... shall give preference to those produced or grown in Texas"); *id.* § 3.28(b) ("supplies, materials, equipment, or agricultural products produced or grown in other states of the United States of America shall be given preference over foreign products"); 1 Tex.Admin.Code § 113 (West Supp.1993–94) (Gen.Serv.Comm'n) (implementing art. 601b).

Having concluded that the state constitutional challenge to this statute is without merit, I must consider the federal standard. While Texas school districts were required to provide educational services for alien schoolchildren residing within the territory of the United States in *Plyler v. Doe*, 457 U.S. 202, 212–13, 102 S.Ct. 2382, 2392, 72 L.Ed.2d 786 (1982), nothing in that opinion suggests that federal equal protection requires the provision of services to aliens living outside the United States. *Id.* at 212–15 & n. 11, 102 S.Ct. at 2392–93 & n. 11 (guarantee extends to "all within the boundaries of a State" and can be invoked by aliens "presen[t] within the State's territorial perimeter").

Assuming that the United States Constitution affords equal protection of the laws to those Swiss citizens who have incorporated as H.L. Farm, they hardly constitute a suspect class. *See De Tenorio v. McGowan*, 510 F.2d 92 (5th Cir.1975) (discrimination against nonresident aliens not subject to strict scrutiny), *cert. denied*, 423 U.S. 877 (1975). *See also Lehndorff Geneva, Inc. v. Warren*, 74 Wis.2d 369, 246 N.W.2d 815, 822 (1976) (discrimination against corporations owned by nonresident aliens not subject to strict scrutiny under federal equal protection clause); *Pedrazza v. Sid Fleming Contractor, Inc.*, 94

---

**5.** In contrast, this Court has recognized that section 13 of Article I assures the right of access to open courts for corporations as well as natural persons. *Dillingham v. Putnam*, 109 Tex. 1, 14 S.W. 303, 304–05 (1890).

**6.** These prior rulings appear reflective of the framers' intent. Members of a national farmers organization known as the Grange constituted the single largest block of delegates at the 1875 constitutional convention. John Mauer, *State Constitutions in a Time of Crisis: the Case of the Texas Constitution of 1876*, 68 Texas L.Rev. 1615, 1640 (1990). The official Granger position was that corporate rights were never vested but always subject to regulation for the public good.

[I]n their creation, [the railroad corporations] were endowed with extraordinary powers and received extraordinary privileges for an equivalent ...: "the public good." Equity would demand that a failure to furnish the equivalent should work a forfeiture of their rights.
Proceedings Of The Second Annual Session Of The Texas State Grange 14–15 (1875). Its official newspaper fiercely proclaimed:
Our constitutions are made and governments are instituted for the benefit and protection of the people and not to foster monopolies and fatten corporations.
Waco Examiner & Patron, July 30, 1875, at 5, col. 3.

N.M. 59, 607 P.2d 597 (1980) (discrimination against nonresident aliens not subject to strict scrutiny under federal equal protection clause); *Alvarez Martinez v. Industrial Comm'n,* 720 P.2d 416 (Utah 1986). Under federal rational basis analysis, the factual assumptions that may have been reasonably made by the Legislature are not to be questioned, and there exists here an imaginable, in truth, very real set of facts affording a rational basis for the statute. I believe, therefore, that the provision should again pass federal muster.

For all of the foregoing reasons, I dissent.

ENOCH, Justice, not sitting.